FILED & ENTERED

JAN 13 2014

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez DEPUTY CLERK

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>CHRISTOPHER EBERTS<br><br>Debtor. | Case No. LA 09-12534 ER<br><br>Chapter 7 |
| JASON M. RUND, Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>R.F.F. FAMILY PARTNERSHIP, LP and RONALD TUTOR,<br>Defendants. | Adv. No. 10-01559 ER<br><br>MEMORANDUM OF DECISION UPON REMAND |
| KRISTIN EBERTS,<br><br>Intervener and Counter-claimant,<br><br>v.<br><br>R.F.F. FAMILY PARTNERSHIP, LP and JASON RUND, Chapter 7 Trustee,<br><br>Counter-defendants. | |

On July 10, 2013, the United States District Court entered an Order Reversing and Remanding in Part and Affirming in Part the Bankruptcy Court's Memorandum of Decision and Judgment after trial ("Remand Order").  On August 30, 2013, Kristin Eberts ("K. Eberts") filed a Motion for Determination and Resolution of Issues from Appellate Order ("Motion"); oppositions and replies were subsequently filed.  On September 19, 2013, this Court ordered further briefing on the remanded issues and took the matter under submission as of November 15, 2013.

The facts underlying this dispute are set forth in the Court's Memorandum of Decision entered on July 11, 2013 and will not be repeated here.  After consideration of the issues upon remand, and for the reasons set forth fully below, the Court finds that title to the real property at issue located at 11496 Orum Road, Los Angeles, CA ("Orum Property") was held in joint tenancy as of October 10, 2007 under In re the Marriage of Marsden, 130 Cal.App.3d 426 (1982) and In re the Marriage of Neal, 153 Cal.App.3d 117 (1984), *reversed* on other grounds by In re Marriage of Buol, 39 Cal.3d 751 (1985).  Moreover, Ronald Tutor ("Tutor") had no moral obligation to payoff the liens senior to that of RFF Limited Partnership, LP ("RFF"); therefore, equitable subrogation does not apply herein.  Finally, K. Eberts has no contribution rights impacting RFF's lien.

//

//

**I**
**ISSUES ON REMAND**

The District Court remanded this matter, in part, for this Court "to make factual finding necessary to determine (1) the Eberts marital community's pro tanto interest in the Orum Property as of October 10, 2007 under the *Moore/Marsden* rule, and (2) whether the Orum Property was community property as of October 10, 2007, based on the reasoning of *In re Marriage of Neal*." Remand Order at 12.  The District Court further directed this Court to "determine whether [Tutor] acted pursuant to a moral obligation and whether equitable subrogation is appropriate under the 'dictates of equity, good conscience, and public policy[,]'" and to determine K. Ebert's rights of subrogation, contribution or reimbursement, if any.  Remand Order at 15-16.

**II**
**DISCUSSION**

**A. The Orum Property was not community property under <u>Neal</u> as of October 7, 2007.**

The Court shall first address whether the Orum Property is community property under <u>Neal</u>, since resolution of this issue could alone dispose of the declaratory relief claims of the Trustee and K. Eberts.  The Court initially notes that by stating that "to the extent [<u>Neal</u>] ***should*** apply in this case," the District Court did not definitively find that <u>Neal</u> governs herein. Remand Order at 12 (emphasis added).  RFF contends that <u>Neal</u> is inapplicable because it relies on a community property presumption set forth in Cal.Civ.C.

4800.1 (now Cal.Fam.C. § 2581), which applies only to division of property in dissolution of marriage or legal separation proceedings.

The Court agrees with RFF.  The Law Revision Commission Comments ("Comments") to Cal.Fam.C. § 2581 provides that this provision "continues former Civil Code Section 4800.1(b) without substantive change."  Moreover, the Comments further state that the "community property presumptions created by Section 2581 are applicable only in dissolution and legal separation proceedings." Courts also have limited § 4800.1/2581's community property presumption to division of property disputes. See In re Marriage of Brooks, 169 Ca.App.4th 176, 188 (2008) ("Family Code section 2581 (the recodification of former Civ.Code, § 4800.1) applies only to the 'division of property on dissolution of marriage or legal separation of the parties.'" This case involves a dispute between a spouse and a purchaser of the subject property.); Rhoads v. Jordan (In re Rhoads), 130 B.R. 565, 567 (Bankr. C.D.Cal. 1991) ("The language of § 4800.1 clearly limits its application to dissolution of marriage."); Schwaber v. Reed ("In re Reed"), 89 B.R. 100, 105 (Bankr. C.D.Cal. 1988), aff'd 940 F.2d 1317 (9th Cir. 1991)(Section 4800.1 "is, by its terms, applicable only in division-of-property disputes that occur upon dissolution of marriage or legal separation.").

Consequently, since this action does not involve division of property upon dissolution or legal separation, the presumption of community property in § 2581 and Neal, which relied on this

presumption, does not apply herein.  Rather, as set forth in Hanf v.

Summers (In re Summers), 332 F.3d 1240, 1243 (9th Cir. 2003)

(citations omitted), which also did not involve a dissolution

proceeding or legal separation,

> [w]here '[t]he grant deed specifically states the
> property is joint tenancy property,' this 'rebuts the
> community property presumption . . .' '[T]he general
> community property presumption is rebutted by the
> affirmative act of specifying joint tenancy title in the
> deed.  Property taken in joint tenancy is presumed to be
> held as joint tenancy property, with each spouse owning
> an undivided one-half interest.'[1]

Id.

Consequently, the Orum Property did not become community property

when K. Eberts transferred title to herself and the Debtor using the

language "husband and wife, as joint tenants," based on the

presumption relied upon in Neal.  Trial Exhibit ("T.E.") 57.  The

Court, therefore, further finds that the Orum Property was not

community property on October 10, 2007 under Neal.

**B. Even applying the *Moore/Marsden* rule, there was sufficient
equity in the Debtor's one-half joint tenancy interest in the
Orum Property to support RFF's $1 million lien.**

Notwithstanding, the District Court instructs this Court to

apply the *Moore/Marsden* rule and make factual findings to determine

whether the marital community acquired an interest (partially or

---

[1] The community property presumption referred to by the Ninth Circuit
in Hanf was the general presumption set forth in Fam.C. § 760. See
also, Reed, 89 B.R. at 105 (Because dispute regarding
characterization of property did not involve dissolution or legal
separation, the relevant provision was not § 4800.1, but Cal.Civ.C. §
5110 (now Fam.C. § 760).).

wholly) in the Orum Property by making mortgage payments and capital

improvements.  Under the *Moore/Marsden* rule,

> '[w]here community funds are used to make payments on
> property purchased by one of the spouses before marriage
> 'the rule developed through decisions in California gives
> to the community a pro tanto community property interest
> in such property in the ratio that the payments on the
> purchase price with community funds bear to the payments
> made with separate funds.'

In re the Marriage of Marsden, 130 Cal.App.3d 426, 436 (1982)
(citations omitted).

Courts also apply the *Moore/Marsden* rule "with equal force to

capital improvements, as a matter of both logic and fairness."  Bono

v. Clark, 103 Cal.App.4th 1409, 1423 (2003); In re Marriage of Allen,

96 Cal.App.4th 497, 501 (2002).  However, "care must be taken to

include only capital improvements, and then only to the extent that

those capital improvements enhance the property's value."  Bono, 103

Cal.App. 4th at 1427. In addition, "in the case of community

improvements, which may not begin immediately upon marriage, equity

may dictate awarding the separate estate any market appreciation

occurring before the community improvements actually begin."  Id. at

426.

K. Eberts contends that application of the *Moore/Marsden* rule

herein requires consideration of the $3 million payoff of the initial

mortgage on the Orum Property, $2 million spent by the marital

community on capital improvements and $700,000 in improvements from

Tutor's gifts to the community.  Motion at 16.  However, the Court

disagrees that the marital community should be credited with the full

amount of or any of the foregoing payments/contributions.

Specifically, with respect to the $3 million payoff, while the

marital community may have incurred the refinancing debt which paid

off the initial mortgage on the Orum Property, community funds were

not used to satisfy the new loan.  Tutor ultimately paid this loan in

full on April 24, 2008 "with his own funds."  Pretrial Conference

Order ("PTO") at ¶ 6(m).  Even if this payment was considered a loan

to K. Eberts, (which as discussed below, it is not), it was made

after the Postnuptial Agreement which deemed this a loan to K. Eberts

and not to the marital community.  At best, the community made

payments on the loan from the date of the refinancing (March 21,

2007) to the date of the Postnuptial Agreement (December 21, 2007),

and should be credited with those amounts only.  However, there is no

evidence of the amounts paid by the marital community during that

period.  Notwithstanding, as will be demonstrated below, even using

the entire $3 million figure, there was sufficient equity in Debtor's

joint tenancy interest in the Orum Property to have given RFF a $ 1

million lien thereon.

With respect to the $2 million in capital improvements, RFF is

correct that "there has been no calculation as to the amount of

increase in the value of the Orum Property that may have occurred via

any amount of community funds used for improvements. In any case,

this Court cannot blindly consider 'gross' expenditures as requested

by Movants."  Supplemental Opposition to Motion at 8.  While Exhibit

202, admitted at trial, and the Debtor's testimony establish that improvements were made to the Orum Property with community funds, there is no evidence that these improvements enhanced the value of the Orum Property and/or by how much. Exhibit C to Supplemental Request for Judicial Notice in Support of Motion ("Supplemental RJN"). K. Eberts' only response to this deficiency is that by using the full increase in the fair market value of the Orum Property and all community contributions, she assigned herself the lowest possible separate interest in the Orum Property and attributed all of the $950,000 appreciation to the community. Eberts' and Ronald Tutor's Supplemental Reply to Opposition of RFF to Motion ("Supplemental Reply") at 7. This is not evidence of any enhancement to the Orum Property's value resulting from the improvements.  Moreover, contrary to K. Ebert's contention, it may not be appropriate to attribute the entire $950,000 appreciation to the improvements, since Exhibit 202 indicates that the improvements appear to have begun around April of 2006, approximately ten months after Debtor and K. Eberts were married.  Since K. Eberts has had an opportunity to provide evidence of any enhancements and/or how much of the actual appreciation is attributable to the improvements in her Reply and Supplemental Reply, but has failed to do so, the Court cannot include capital improvements in its *Moore/Marsden* calculations.

      With respect to the $700,000 in stone provided by Tutor, the record is replete with Tutor's testimony that he gifted all of the

stone to K. Eberts *and* Debtor. February 13, 2012 Trial Transcript

("Transcript") at 120-129.  Consequently, since the stone was a gift

to the community, it was a community contribution to the Orum

Property.  However, as with the capital improvements, K. Eberts had

an opportunity to provide evidence of the enhancement in the value of

the Orum Property, and/or of the portion, if any, of the actual

appreciation attributable to the stone contribution, but did not.

Consequently, the Court also cannot include this contribution in

determining the community's interest in the Orum Property.

Even if the Court were to credit the marital community

with the entire $3 million payoff, which is not appropriate as

discussed above, the value of Debtor's joint tenancy interest

would have been sufficient to allow Debtor to give RFF a $1

million lien on the Orum Property based on the foregoing

*Moore/Marsden* calculation, even if the cases were applicable:

| | | |
|---|---|---|
| Purchase price on April 22, 2005 | | $4,750,000 |
| Less community payments (Assuming payoff of first lien from refinance by marital community) | $3,000,000 | (62%) |
| Joint tenancy interest ($900,000 each down payment from K. Eberts and Debtor) | $1,800,000 | (38%) |
| FMV as of 1/31/08 | | $5,700,000[2] |
| Less purchase price | $4,750,000 | |
| Appreciation during marriage | | $ 950,000 |
| Joint tenancy interest: | | |
| Down payments | $1,800,000 | |

---

[2] This is the fair market value as of January 31, 2008, which is approximately three and one-half months after RFF's October 10, 2007 deed.  RFF has not objected to the use of this value.

```
              38% of appreciation aft. Marriage $  361,000[3]
                                                 $2,161,000

   Community property interest:
        Loan payments                           $3,000,000
        62% of appreciation aft. Marriage $  589,000
                                                 $3,589,000
```

See Marsden, 130 Cal.App.3d at 439-440.

Based on the foregoing, even considering the full amount of the $3 million payoff (the entirety of which, as discussed above, should not be considered), the value of the joint tenancy interest in the Orum Property around the time of RFF's October 10, 2007 deed was $2,161,00 under the *Moore/Marsden* rule.  Consequently, Debtor's joint tenancy interest was approximately $1,080,500 ($2,161,000/2), and Debtor could, therefore, encumber the Orum Property with RFF's $1 million deed of trust acting alone, even though the marital community may have had an interest in the property.  The Court finds that RFF's lien is not nullified by the application of the *Moore/Marsden* rule.

**C. As a threshold matter, K. Eberts did not preserve any equitable subrogation claim.  Notwithstanding, Tutor is not entitled to equitable subrogation based on a moral obligation.**

**1. Although referred to in the Pretrial Conference Order ("PTO"), K. Eberts did not pursue an equitable subrogation claim at trial or otherwise, and therefore, did not preserve this claim.**

As noted in the Remand Order, both Tutor and K. Eberts are claiming to have a lien prior to RFF's lien under a theory of equitable subrogation.  Specifically, Tutor gave/loaned K. Eberts

---

[3] The Marsden court further credited the spouse who owned the subject property prior to marriage with the appreciation which accrued from the time of purchase up to the date of marriage, because that spouse had owned the property for nine years prior to marriage. Id. The Court shall not include this credit since K. Eberts and Debtor were married approximately six weeks after the Orum Property was purchased.

monies to pay off the liens of Washington Mutual ("WAMU") and

judgment creditors, all of which were prior to RFF's lien.  In sum,

both are claiming equitable subrogation based on the same repayment

monies.  However, both Tutor and K. Eberts cannot be entitled to

equitable subrogation.  Remand Order at 16 ("Indeed, this Court does

not see how both [Tutor](loans) and K. Eberts (payments from those

loans) could be equitably subrogated to the senior position of WAMU

and [judgment] liens.").

        The Remand Order notes that "the record demonstrates that K.

Eberts did not advance [an equitable subrogation argument] at trial."

Id. Consequently, the District Court has instructed this Court to

determine as a threshold matter whether K. Eberts preserved this

claim in this case.  Remand Order at 17.  K. Eberts argues:

> [she] preserved her claim for equitable subrogation
> because she asserted it in her initial filings in this
> lawsuit, she raised it in the [PTO], presented the
> relevant evidence at trial, and argued essentially the
> same issue in her Post-Trial Brief.

Motion at 23.

K. Eberts notes, however, that the relevant facts for her equitable

subrogation claim were "discussed in the context of contribution" in

her Post-Trial brief.  Id.  The Ninth Circuit Bankruptcy Appellate

Panel has held that where an issue is referenced in a joint pretrial

order, but is not raised in the lower court or addressed at trial,

such issue cannot be asserted on appeal.  Fox v. Karlin (In re

Karlin), 112 B.R. 319, 322 (9th Cir. BAP 1990).  Consequently, this

Court finds that because K. Eberts admittedly did not expressly

pursue an equitable subrogation claim before this Court at trial or otherwise, she did not preserve this claim and cannot now raise it. Tutor, therefore, is the only party entitled to advance an equitable subrogation claim.

**2. The Court finds that Tutor had no moral obligation to pay the WAMU and judgment liens which were prior to the RFF lien. Consequently, he is not entitled to equitable subrogation based on a moral obligation.**

With respect to Tutor's equitable subrogation claim, the Remand Order directs this Court "to determine whether [Tutor] acted pursuant to a moral obligation and whether equitable subrogation is appropriate under the 'dictates of equity, good conscience, and public policy.'"  Remand Order at 15.  Tutor asserts that he had a moral family obligation to pay the WAMU and judgment liens, and relies on excerpts from his trial testimony that he did it for his daughter, K. Eberts, and because he felt he had to bail Debtor out whenever Debtor did something wrong. Motion at 19. Tutor further contends that RFF will "reap a massive and unwarranted benefit because [he] loaned money to pay off the preexisting WAMU mortgages totaling $5,340,580.53 and $575,000 to pay off the . . . judgment liens, which would have reduced RFF's recovery in the event it sought to enforce its judgments . . . ."  Motion at 21.

The Court first notes that whether RFF reaps a windfall from Tutor's payment of senior liens does not go to the issue of moral obligation, which is the only issue the District Court ordered this Court to consider.  In deciding whether Tutor had a moral obligation

to pay K. Eberts' loans, the issue before the Court is whether a parent has a moral obligation to pay the debts of his/her competent, adult child.  While the Court understands a parent's strong need and desire to help his/her children whenever possible, the Court does not believe that this need and desire translates into a moral obligation to fix all problems, including paying debts.  While it was unquestionably helpful to K. Eberts for Tutor to satisfy the foregoing liens, the Court finds that he was under no moral obligation to do so, and therefore, Tutor is not entitled to a lien senior to that of RFF based on equitable subrogation.

**D. K. Eberts did not make any payments entitling her to contribution.**

**1. K. Eberts has no contribution rights with respect to the payoff of the WAMU and judgment liens.**

With respect to K. Ebert's contribution claim, the Remand Order directs this Court to "make the predicate determination whether K. Eberts actually made any payment(s) that would entitle her to [contribution]. Specifically, did [Tutor] make payments to satisfy the WAMU and [judgment] liens, or did K. Eberts make these payments with funds borrowed from [Tutor]?"  Remand Order at 17.  Based on the record, it is undisputed that Tutor was the source of the payments to WAMU and judgment lienors.  However, he claims to have loaned these funds to K. Eberts. Transcript at 137-138.  The terms of this "loan" are that K. Eberts shall repay it from the sale of stocks held in trust created for her by Tutor, and such payment is due in 2016. Id.

at 138 and 148, lines 19-25. As of the trial date, the stocks were worth between $16 and $17 per share, but Tutor expected/hoped they would increase by the time of payment. Id. at 159, lines 22-24, 160, lines 5-9. Approximately three years ago, the stocks were worth between $55 and $60 per share. Id. at 160, lines 14-16.

Notwithstanding the foregoing testimony, the Court finds that Tutor, not K. Eberts, made the payments for which K. Eberts seeks contribution. First of all, the note evidencing this "loan" was executed in February 3, 2009, approximately ten months **after** Tutor had already satisfied the WAMU and judgment liens, and two days before Debtor filed bankruptcy. Transcript at 147. K. Eberts is not obligated to make any payments until 2016, eight years after Tutor paid the liens, with stocks expected to at least triple in value by the due date. There is no evidence that even at $60 per share the stocks will be sufficient in value to repay the "loan."

Moreover, Tutor testified that he has previously "loaned" K. Eberts funds to buy a house. Id. at 146. When asked about this transaction, Tutor first stated that he "bought" this house for K. Eberts, but within the same statement, corrected himself and stated that he "lent her the money" to make the purchase. Id. at lines 7-9. Based on Tutor's testimony, it does not appear that K. Eberts repaid this "loan," or that Tutor had any concern whether he would be repaid. Specifically, K. Eberts did not sign a note for this loan, and Tutor did not need a note because he trusted her. In addition,

they had an understanding that she would repay him from her trust, and "it was not a great deal of money to [him]." Id. at lines 15-25. When asked if he intends to do anything to collect the amounts due from K. Eberts if he is not repaid from the trust fund, Tutor responded that he would "cross that bridge when [he] get[s] to it, and that he believed in his company and the value of its stock. Id. at 160, lines 10-13.

Moreover, when K. Eberts sold her first house for about $1.2 million, Tutor allowed her to use these proceeds for her part of the down payment on the Orum Property and he made no demand for repayment of the first "loan" from these funds. Transcript at 147 and 177, lines 3-10. There is no testimony that K. Eberts used any of those proceeds to make even a partial payment to her father for this first "loan." In addition, K. Eberts has not repaid any of the $900,000 "loan" for the down payment on the Orum Property. Id. at 155, lines 8-10. Tutor further testified that it was correct that the "only amount that any family member has repaid to [him] from the sums [raised at trial] is the sum of less than $100,000 that [he] received from Tracy Maltas . . . ."[4] Id. at 158.

Although not classified as a "loan," Tutor also gave K. Eberts a monthly stipend of $52,000, and approximately $100,000 per year for five years for K. Eberts' business, the Aura Boutique. Id. at 155-157. Tutor gave her the latter funds even though he believed the

---

[4] Tracy Maltas is Tutor's daughter. Id. at 153, lines 20-22.

business would not be successful.  Id. at 157, lines 2-5.  Tutor also

loaned $3.5 million to his other daughter, Tracy Maltas, to purchase

property.  Id. at 154, lines 7-13.  As noted above, Ms. Maltas had

repaid less than $100,000 of this loan and the remainder is

outstanding.  Id. lines 14-18.

Consequently, the record indicates that Tutor has given K.

Eberts large sums of money on several occasions and classified some

as loans, some as gifts and some as a monthly stipend.  The Court

finds that the "loan" terms between Tutor and K. Eberts are loose at

best, and these transactions are really based on familial trust.  In

addition, K. Eberts has not made any payments with respect to any of

these "loans" from Tutor, and if she fails to do so in 2016, there

are no default provisions in place; rather, Tutor's only plan is to

cross that bridge when and if he comes to it. There is also no

evidence that K. Eberts' shares in her trust fund will have

sufficient value to make the payment due in 2016.  Tutor has made at

least one generous loan to his other daughter, of which she has

repaid approximately 3%.  Based on the foregoing, despite attempting

to couch the payments as "loans" to K. Eberts, the Court finds that

Tutor paid off the WAMU and judgment liens for which K. Eberts seeks

contribution, and these payments were not loans to K. Eberts.

Consequently, K. Eberts cannot seek contribution for the payoff of

the WAMU and judgment liens, since she has made no such payments.

//

**2. Although not raised in the Remand Order, K. Eberts has no contribution rights with respect to her payment of property taxes and property preservation costs incurred between January 2008 and January 2012.**

Although not expressly addressed in the Remand Order, K. Eberts also seeks contribution rights for her payment of property taxes for the period between January 2008 and January 2012 and property preservation costs during this same four year period. Motion at 28, footnote 13.  However, these payments were made after the Postnuptial Agreement was entered into on December 21, 2007. K. Eberts testified that the purpose of this agreement was to separate the community property and her finances from Debtor, so that she and Debtor would not share anything in that way anymore. Transcript at 34, lines 16-20, 44, lines 3-7.  Specifically, pursuant to the Postnuptial Agreement, K. Eberts received title to the Orum Property as her separate property and gave up any relationship she had with Debtor's business and income; Debtor gave up rights to her business, income and home as well. Id. at 36, line 3; and 37, lines 1-14.

K. Eberts further testified that after the Post-Nuptial Agreement was signed, the mortgage and judgment liens were paid off with monies from her father, which this Court has determined were not loans to her. Id. at 38, lines 2-7, 41, lines 15-24. In addition, K. Eberts paid the real estate taxes, landscaping fees, pool maintenance, utilities, homeowners insurance and the security system charges.  Id. at 38-39.  The items which K. Eberts bases her alleged

contribution rights (property taxes and property preservation costs) were incurred *after* she and the Debtor agreed to separate their finances in the Post-Nuptial Agreement was executed. Consequently, K. Eberts has no contribution rights for these items which at that time they were incurred, Debtor had no obligation to pay.

### III
### CONCLUSION

Based on the foregoing, after consideration of the issues upon remand, the Court awards judgment in favor of RFF with respect to the declaratory relief claims of the Trustee and K. Eberts.  The Court shall prepare a judgment consistent with this memorandum of decision.

### ###

Date: January 13, 2014

Ernest M. Robles
United States Bankruptcy Judge